UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS – WACO DIVISION

| | |
|---|---|
| JOHN DOE[1], <br><br> Plaintiff, <br><br> -against- <br><br> BAYLOR UNIVERSITY, <br><br> Defendant. | Civil Action No.: 6:19-cv-465 <br><br> **COMPLAINT** <br><br> **<u>Jury Trial Demanded</u>** |

Plaintiff, JOHN DOE[1] ("Doe" or "Plaintiff"), by and through his undersigned counsel, sues Defendant, BAYLOR UNIVERSITY, an educational institution located in Texas ("Baylor" or "Defendant"), and seeks damages and any other and further relief that this Court deems just and proper, and states as follows:

## <u>NATURE OF THE CASE</u>

1.      Plaintiff was employed at Baylor as an Assistant Professor in Baylor's Department of Economics from August 10, 2015 until November 12, 2018, when he was constructively discharged following Baylor's biased and flawed investigation related to false allegations of sexual misconduct.

2.      Plaintiff engaged in a consensual relationship with Complainant.

3.      Plaintiff eventually decided to end his relationship with Complainant.

4.      After the relationship ended, Complainant falsely accused Plaintiff of sexual misconduct.

5.      Despite clear evidence that Complainant's allegations were false and that

---

[1] Plaintiff John Doe will file a Motion to Proceed Under a Pseudonym related to this Complaint upon having the opportunity to confer with Defendant's counsel regarding the issue.

Complainant was not credible, Baylor found Plaintiff responsible for sexual misconduct solely as a result of his male gender.

6.      Baylor has been an ignominious player in the ongoing national discussion of how colleges and universities handle allegations of sexual misconduct made by female students.

7.      As part of its quest for redemption, Baylor enacted a university-wide culture of anti-male bias and intimidation inconsistent with its stated Christian principles that ensnared Plaintiff, besmirched his character, and destroyed his career.

8.      As a result of Baylor's erroneous decision, Plaintiff, a rising star in the Baylor Economics Department, was constructively discharged from his position as a professor of economics.

9.      Plaintiff's constructive discharge by Baylor was motivated solely by his male gender.

10.     Plaintiff was treated differently than his female colleagues in the Economics Department.

11.     Since his constructive discharge, Plaintiff has been unable to find employment as a college or university professor.

## PARTIES

12.     Plaintiff is, and at all times relevant hereto was, a resident of McLennan County, Texas.

13.     Defendant Baylor is, and at all times relevant hereto was, an educational institution conducting business in the State of Texas.

## JURISDICTION

14.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law and (ii) the state

law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

15.     This Court has personal jurisdiction over Defendant because Defendant is a resident of the State of Texas and conducts business within the State of Texas.

16.     All conditions precedent to the filing of this action have occurred, accrued, or been waived as a matter of law.

## VENUE

17.     Pursuant to 28 U.S.C. § 1391, venue for this action properly lies in the U.S. District Court for the Western District of Texas because the acts or omissions giving rise to this Complaint occurred in this district.

## FACTUAL ALLEGATIONS

### A.  Baylor's History Of Mishandling Title IX Claims

18.     Between 2012 to 2016, Baylor failed to properly investigate allegations of sexual assault made by female students against male members of its NCAA Division I football team.

19.     Baylor faced widespread criticism for its mishandling of these allegations.

20.     The United States Department of Education Office for Civil Rights ("OCR") opened an investigation related to Baylor's mishandling of these allegations on October 18, 2016.

21.     OCR's October 18, 2016 investigation remains open as of August 2, 2019.

22.     In 2015, responding to the public revelation that it had routinely mishandled sexual misconduct cases, Baylor hired Pepper Hamilton to conduct an internal investigation of its Title IX procedures.

23.     In 2016, Pepper Hamilton issued a report that found that Baylor failed to effectively implement Title IX.

24.     The Pepper Hamilton report included more than 100 recommendations to address

Baylor's Title IX deficiencies.

25.     One of Pepper Hamilton's recommendations was for Baylor to provide more support for victims of sexual assault.

26.     In 2016, Baylor issued the "Baylor University Board of Regents Findings of Fact," which acknowledged Pepper Hamilton's recommendations and stated, "The University has taken and will take additional steps to address the deficiencies noted in the findings of fact."

27.     Since 2016, Baylor was sued at least 11 times by alleged female victims of sexual assault for its failure to properly investigate their claims.

**B.  Baylor Responds To Public Shaming and Pressure By Instituting A Culture of Anti-Male Bias**

28.     In an April 10, 2013 article in the Baylor Lariat titled "Alumna to speak on sexual assault, hope to open eyes," Baylor associate professor of religion Dr. Jonathan Tran noted, "Usually with sexual assault the emphasis is put on women and how they can protect themselves, putting all the responsibility on them. . . .Whereas the emphasis should be put on men learning respect."

29.     In a September 6, 2013 article in the Baylor Lariat titled "Baylor implements new sexual assault prevention campaign," Dr. Cheryl Wooten, staff psychologist at the Baylor Counseling Center stated, "Assaults tend to happen on campuses where there are stereotypical gender roles. . . .If [assaults] are strictly defined where men have more power in relationships, there will be an increase in number of sexual assaults."

30.     Dr. Wooten further noted, "I think as a community if we all agree to be watching, could we catch some of these guys? I think so."

31.     On April 23, 2015, Baylor's Office of Community Engagement & Service and the Title IX Office held a discussion on sexual assault prevention for all males on campus.

32.     The purpose of the April 23, 2015 discussion led by Ian McRary, Baylor's Title IX officer from February 2015 to January 2016, was to educate Baylor's male student population on how to prevent sexual assault.

33.     "It's On Us" was launched by the White House Task Force to Prevent Sexual Assault in September 2014 to combat sexual assault on college campuses by engaging young men and changing campus culture.

34.     "It's On Us at Baylor" is a student-run group dedicated to fighting sexual violence at Baylor.

35.     Baylor endorses the activities of "It's On Us" and "It's On Us at Baylor."

36.     In April 2016, Baylor sponsored the "It's On Us Pledge Drive."

37.     The description of the It's On Us Pledge Drive stated, in part, "Students, faculty and staff are encouraged to take the It's On Us pledge."

38.     Baylor also permits "It's On Us" and "It's On Us at Baylor" to place posters on its campus.

39.     The "It's On Us" and "It's On Us at Baylor" posters displayed in Baylor's bathrooms exclusively portray men as "perpetrators."

40.     The "It's On Us at Baylor" Twitter page includes tweets advocating that rapists should be "castrated."

41.     The "It's On Us at Baylor" Twitter page also includes tweets stating that "Rape is caused by misogyny, not by women's clothing."

42.     In 2016, Baylor officials in spiritual life, multicultural affairs, and the counseling center collaborated to form Men for Change, an organization comprised of both Baylor staff members and students that offers presentations, panel discussions and mentoring sessions on the

topics of active spirituality, healthy relationships, and masculinity.

43.     Josh Ritter, Baylor's Assistant Director of Spirituality and Public Life, has stated that the purpose of Men for Change is to shed light on sexual assault and toxic masculinity.

44.     Ritter noted that Men for Change is "really interested in disrupting this power dynamic that says that men are supposed to be powerful and dominant over women, which is not OK."

45.     David Copeland, a Baylor staff member who works in the Department of Health, Human Performance and Recreation, said that Men for Change is "pretty supportive of the message that is being presented, with men being accountable to other men and calling men to be something more, something better."

46.     On November 13, 2017, Baylor's Office of Diversity and Inclusion hosted a This Matters Panel focused on #MeToo (the "#MeToo Panel").

47.     The #MeToo Panel was held in the Barfield Drawing Room, one of the larger and most central venues on campus.

48.     The purpose of the #MeToo Panel was to discuss how Baylor can reform the perceived stigma and mentality surrounding sexual and interpersonal violence.

49.     One of the #MeToo Panel members was Dr. Mito Diaz-Espinoza, program manager for Baylor's First in Line program.

50.     During the event, Diaz-Espinoza stated, "One of the things to really push change is to change the culture of men. It's said that it's better to raise healthy boys than to fix broken men."

51.     He further noted, "[Men] should start understanding that the actual physical and emotional violence that they're perpetrating against others is what [they] need to face."

52.     Baylor's 2018 Annual Fire Safety And Security Report uses the term "victim" 95

times.

53.     Baylor faculty members are required to take and pass short online courses, trainings on sexual violence, harassment, and civil rights.

54.     These courses exclusively portray males as perpetrators and women as victims.

**C.  Plaintiff's Superiors Confirm The Existence of Anti-Male Bias**

55.     When Plaintiff started working at Baylor during the Fall 2015 semester, he placed a large Baylor flag on the transparent glass door to his office so that he could limit distractions to better focus on his research.

56.     One of Plaintiff's supervisors, Scott Gardner, told Plaintiff that hanging the flag was dangerous because a female student could falsely accuse Plaintiff of misconduct.

57.     Gardner informed Plaintiff that he needed to be very careful as a result of the current atmosphere at Baylor.

58.     At this time, Baylor had already hired Pepper Hamilton to investigate the scandal surrounding Baylor's Title IX failures.

59.     Female professors and staff members who worked on the same floor as Plaintiff left their transparent glass doors covered during this time period.

60.     At the beginning of the Spring 2017 semester, Steve Green, another one of Plaintiff's supervisors, warned Plaintiff to protect himself from female students who may accuse him of misconduct.

61.     This warning was based on the "environment" on Baylor's campus regarding allegations of sexual misconduct.

62.     Green informed Plaintiff if an allegation was made against him by a female student, Baylor would favor the female student because Plaintiff was a man.

63.     During the Spring 2017 semester, Plaintiff's office hours were 4:00PM to 5:00PM.

64.     Green advised that Plaintiff could protect himself by leaving the door to his office open when a female student was present during Plaintiff's office hours or any other time that a woman was in Plaintiff's office.

65.     Green told Plaintiff that under no circumstances should he allow a female student in his office after 5:00PM.

66.     The automatic entrance to the Economics Department closed at 5:00PM.

67.     The instructors with offices near Plaintiff's office typically left before 5:00PM.

68.     As a result, Green was concerned that there would be no witnesses in the department to testify in Plaintiff's defense if a female student present in his office after 5:00PM made a sexual misconduct claim.

69.     If Plaintiff's office hours were over, Green suggested that Plaintiff not have any contact with female students other than asking them to come back during regular business hours.

70.     Female professors are not expected to observe the same protocol that Green told Plaintiff to follow.

71.     Cherise Bridgwater, a female professor in the Baylor Economics Department, was allowed to have female students in her office with the door closed.

72.     During the Spring 2018 semester, Gardner informed Plaintiff that "Baylor does not tolerate violence against women."

73.     Gardner's statement indicated that Baylor believes only women are victims of violence.

**D.  Plaintiff's Relationship With Complainant**

74.     Plaintiff met Complainant at her place of employment during the summer of 2017.

75.     One day in November 2017, Plaintiff spoke with Complainant at her place of

employment and told her that he would be watching a sporting event later that evening if she was interested in joining him.

76.     Complainant willingly joined Plaintiff to watch the sporting event.

77.     Plaintiff and Complainant went on three dates between November 2017 and January 2018.

78.     Between November 2017 and January 2018, Plaintiff and Complainant engaged in one consensual sexual interaction.

79.     In January 2018, Plaintiff informed Complainant that he was looking for a long-term partner for marriage.

80.     After it became clear that Complainant did not have the same goal in mind, Plaintiff and Complainant amicably decided to stop seeing each other in early February 2018.

81.     Plaintiff and Complaint began dating again in late April 2018.

82.     Between May 20, 2018 and May 22, 2018, Plaintiff and Complainant took a vacation together to Utah.

83.     While on vacation in Utah, Plaintiff stated his intention to end the relationship after he caught Complainant lying to him.

84.     Complainant was upset and sought to maintain her relationship with Plaintiff.

85.     Prior to May 22, 2018, Complainant had been evicted from her previous residence, where she had been living illegally.

86.     While Plaintiff did not see a future with Complainant, he permitted her to stay at his home from May 22, 2018 and May 27, 2018 while she waited for her new lease to start.

87.     Complainant freely left and returned to Plaintiff's home on multiple occasions between May 22, 2018 and June 6, 2018.

88.     On June 6, 2018, Plaintiff once again informed Complainant that he wanted to end their relationship as a result of her lies.

89.     Once again, Complainant became very upset.

90.     On June 7, 2018, Complainant called Plaintiff.

91.     During the phone call, Plaintiff stated once again that he wanted to end their relationship because Complainant was not truthful to him.

92.     Complainant began to argue with Plaintiff during the phone call.

93.     While Complainant was arguing with him, Plaintiff hung up the phone.

94.     Between late April 2018 and June 7, 2018, all sexual interactions between Plaintiff and Complainant were consensual.

**E.  Baylor Encourages Complainant To File A Title IX Report And Exhibits Bias**

95.     After her consensual relationship with Plaintiff ended, Complainant made false allegations about Plaintiff's behavior to Baylor's Title IX Office.

96.     Baylor's Title IX Coordinator, Laura Johnson, encouraged Complainant to file a Title IX report against Plaintiff.

97.     Johnson's encouragement was based on a presumption that because she was a female and Plaintiff was a male, the allegations made by Complainant against Plaintiff would be sustained.

98.     Complainant conveyed Johnson's presumption to her friend, Mathew Cruz, *via* text message.

99.     According to Complainant, Johnson told her, "even if [Complainant] didn't have good evidence [Baylor] wouldn't be in the position to doubt [Complainant]."

100.    During her intake meeting with Complainant, Johnson improperly assigned

credible probative value to Complainant's statements.

101. Johnson improperly assured Complainant that Complainant's actions and statements that directly contradicted her claims would have no impact on Baylor's assessment of her allegations against Plaintiff.

102. Specifically, Johnson told Complainant that her continued co-habitation with Plaintiff after the alleged misconduct and her statement that sex with Complainant was consensual would not affect her claims.

**F. Timeline Of Title IX Process Related To Complainant's Allegations**

103. On July 2, 2018, Baylor sent Plaintiff a Notice of Investigation informing him that Complainant made several sexual misconduct allegations against him.

104. The Notice of Investigation indicated that Baylor would be investigating four allegations made by Complainant – (1) sexual assault involving non-consensual sexual penetration on May 20, 2018; (2) sexual assault involving non-consensual sexual penetration "sometime between May 22 and May 27, 2018"; (3) sexual exploitation as a result of Plaintiff allegedly climaxing in Complainant despite her objection on May 7, 2018 and "twice between May 22 and May 27, 2018"; and (4) intimate partner violence by committing sexual assault and sexual exploitation.

105. Carolyn Hughes was assigned to investigate Complainant's allegations.

106. Hughes issued the Preliminary Investigative Report on August 29, 2018.

107. Hughes issued the Preliminary Investigative Report with Addendum on September 27, 2018.

108. Hughes issued the Final Title IX Office Investigative Report on October 10, 2018.

109. In the Final Title IX Office Investigative Report, Hughes found Plaintiff "responsible" for (1) sexual assault involving non-consensual sexual penetration on May 20, 2018;

(2) sexual assault involving non-consensual sexual penetration "on a day between May 22 and May 27, 2018"; (3) sexual exploitation as a result of Plaintiff allegedly climaxing in Complainant despite her objection on May 7, 2018; and (4) intimate partner violence.

110.    Hughes determined that Plaintiff was "not responsible" for sexual exploitation related to Complainants assertions that he ejaculated in Complainant's vagina despite her objection on two occasions between May 22 and May 27, 2018.

111.    The Title IX Hearing was held on November 14, 2018.

112.    On November 14, 2018, the Title IX Review Panel unanimously affirmed the findings of "responsible" reached by Hughes in the Final Title IX Office Investigative Report.

113.    On November 30, 2018, Johnson sent Plaintiff the Official Notice of Title IX Review Panel Determination, informing Plaintiff that the Review Panel's determination to uphold the original findings of responsibility was final.

**G. Charles North Admits The Bias In Baylor's Title IX Process And Hughes' Inability To Conduct A Fair and Competent Investigation**

114.    Charles North, Chair of the Economics Department at Baylor University, offered a frank assessment of Baylor's Title IX system and Hughes' capabilities during a conversation with Plaintiff on August 14, 2018.

115.    In discussing the Complainant's allegations with Plaintiff, Dr. North provided his first-hand observations of the systemic gender bias inherent in Baylor's Title IX system.

116.    Dr. North noted his belief that Baylor's Title IX system was biased.

117.    He also indicated that because of the "culture" at Baylor, Title IX investigators were prone to conclude that a violation occurred as soon as an allegation was made.

118.    Dr. North further stated that Plaintiff was only charged because of the anti-male bias inherent in Baylor's Title IX system.

119.    He went on to note that Plaintiff would need to prove that he did not engage in sexual misconduct, which was a higher standard than Baylor showing that he did engage in such conduct.

120.    Dr. North also told Plaintiff that, at Baylor, a male professor accused by a female student is considered guilty until proven innocent.

121.    Dr. North directly stated that Hughes "is not fair."

122.    He further stated that he was not sure that Hughes could be trusted to be unbiased.

123.    Dr. North also questioned whether Hughes had the appropriate skill, training, and background to perform the tasks necessary to conduct a competent Title IX investigation.

## H.  Baylor's Investigation And Adjudication Of Complainant's Allegations Were Impermissibly Biased And Reached The Incorrect Conclusion

124.    Hughes failed to comply with the SGBH Policy during her investigation and while compiling the various Title IX reports.

125.    Hughes' failure to comply with the SGBH Policy was motived by gender bias based on Plaintiff's status as a male.

126.    Hughes incorrectly determined that Plaintiff was "responsible" for (1) sexual assault involving non-consensual sexual penetration on May 20, 2018; (2) sexual assault involving non-consensual sexual penetration "on a day between May 22 and May 27, 2018"; (3) sexual exploitation as a result of Plaintiff allegedly climaxing in Complainant despite her objection on May 7, 2018; and (4) intimate partner violence.

127.    Hughes' incorrect determinations were motivated by gender bias based on Plaintiff's status as a male.

128.    The Title IX Review Panel, which consisted of three females, failed to comply with the SGBH Policy while adjudicating Complainant's allegations against Plaintiff.

129.     The Title IX Panel's failure to comply with the SGBH Policy was motivated by gender bias based on Plaintiff's status as a male.

130.     The Title IX Review Panel incorrectly determined that Plaintiff was "responsible" for (1) sexual assault involving non-consensual sexual penetration on May 20, 2018; (2) sexual assault involving non-consensual sexual penetration "on a day between May 22 and May 27, 2018"; (3) sexual exploitation as a result of Plaintiff allegedly climaxing in Complainant despite her objection on May 7, 2018; and (4) intimate partner violence.

131.     The Title IX Review Panel's incorrect determinations were motivated by gender bias based on Plaintiff's status as a male.

132.     The Review Panel failed to comply with the SGBH Policy when deciding Plaintiff's appeal.

133.     The Review Panel's failure to comply with the SGBH Policy was motived by gender biased based on Plaintiff's status as a male.

134.     The Review Panel incorrectly upheld the Title IX Review Panel's findings of responsibility for (1) sexual assault involving non-consensual sexual penetration on May 20, 2018; (2) sexual assault involving non-consensual sexual penetration "on a day between May 22 and May 27, 2018"; (3) sexual exploitation as a result of Plaintiff allegedly climaxing in Complainant despite her objection on May 7, 2018; and (4) intimate partner violence.

135.     The Review Panel's incorrect affirmations of the Title IX Review Panel's findings were motived by gender bias based on Plaintiff's status as a male.

**I.   Baylor Failed To Provide Timely And Equal Access To Information**

136.     The SGBH Policy states, "During the investigation and adjudicatory process, both parties (complainant and respondent) have equal rights . . . to timely and equal access to

information that will be used in disciplinary proceedings[.]"

137.    Plaintiff requested the notes related to Complainant's intake meeting.

138.    Plaintiff never received the notes related to Complainant's intake meeting.

139.    Complainant had access to the notes related to Plaintiff's intake meeting.

140.    Even though Plaintiff did not have access to the notes related to Complainant's intake meeting, Baylor used the notes in the disciplinary proceedings.

141.    Plaintiff's intake meeting statements were made part of the Final Title IX Office Investigative Report.

142.    Complainant's intake meeting statements were not made part of the Preliminary Investigative Report, the Preliminary Investigative Report with Addendum, or the Final Title IX Office Investigative Report.

143.    The Complainant's intake meeting interview notes show that that there was at least one contradiction between Complainant's intake statement and her subsequent interview with Hughes.

144.    Complainant initially claimed she was assaulted twice in Utah, but later stated she was only assaulted once.

145.    Plaintiff had a good-faith belief that there were additional inconsistencies in Complainant's statements to Baylor.

146.    Baylor refused to provide Plaintiff with a copy of Complainant's intake meeting notes despite his repeated requests.

147.    As a result, Plaintiff was unable to identify any additional inconsistencies in Complainant's statements to Baylor.

**J.   Baylor's Failed To Equally Assess The Evidence**

148.    The SGBH Policy states, "The investigator will review all information identified or provided by the parties and will determine the appropriateness, relevance, and probative value of the information developed or received during the investigation."

149.    Hughes ignored evidence regarding the nature of Complainant's relationship with Plaintiff that provided the full context of the relationship.

150.    Hughes failed to properly consider evidence that Complainant's allegations were false.

151.    Hughes failed to properly consider Complainant's statements that she and Plaintiff "agreed to use a condom" and that she was getting Plan B because "the condom broke."

152.    Hughes did not properly consider the fact that Complainant moved into Plaintiff's home for nearly a week after she claims he assaulted her in Utah.

153.    Hughes did not properly consider the fact that Complainant remained in Plaintiff's home while she alleged that Plaintiff's assaults were ongoing.

154.    Hughes did not properly consider Complainant's statement that an instance of sex with Plaintiff after returning from Utah was "a really sweet moment and it was fun and we did it, and it was fully consensual."

155.    Hughes did not properly consider Complainant's admission that she visited Plaintiff's home and stayed overnight on several occasions after she moved out of his home on May 27, 2018.

156.    Hughes failed to properly consider the gifts that Complainant gave to Plaintiff after the alleged incidents giving rise to the investigation occurred.

157.    Hughes did not properly consider Complainant's comments regarding her

relationship with Cruz.

158.     Complainant's comments to Cruz occurred more than a week after the final alleged assault.

159.     Complainant's comments to Cruz indicate a failing relationship rather than an exploitative or non-consensual one.

160.     Hughes failed to properly consider significant inconsistencies in Complainant's testimony.

161.     Complainant claimed that she purchased the Plan B pill on May 7, 2018 because Plaintiff climaxed in her without her consent.

162.     Complainant's bank statement shows she actually purchased the pill on May 1, 2018, one week before the alleged incident.

163.     When confronted with this information, Complainant changed her story and stated that she thought about buying another Plan B on May 8, 2018 but decided not to do so because she either thought the earlier one would still be effective or she started her period.

164.     Complainant claimed she purchased Plan B between May 22 to May 27 because Plaintiff allegedly climaxed in her without her consent twice over that five-day period.

165.     This claim is contradicted by Complainant's own text messages with witness Cruz where she stated that she was considering buying Plan B because "the condom broke."

166.     On June 2, Complainant texted Cruz and told him that she was going to return the Plan B.

167.     Hughes made findings and conclusions not supported in the record.

168.     Hughes found Plaintiff responsible of non-consensual penetration in Utah despite Complainant's admissions of having consensual sexual activity in Utah.

{1148970.1 }                                    17

169.    Hughes found Plaintiff responsible for the second alleged non-consensual penetration even though Complainant provided no details of the incident and was unable to give the precise date of the alleged encounter.

170.    Hughes found Plaintiff responsible for sexual exploitation despite Complainant's material discrepancy of her alleged purchase of Plan B in relation to the date of the alleged assault.

171.    Hughes found Plaintiff responsible of intimate partner violence despite the lack of any evidence that Plaintiff sexually exploited or sexually assaulted Complainant.

172.    Hughes found Plaintiff responsible of intimate partner violence despite the fact that Complainant's testimony lacks any allegations of or threats of violence.

173.    Hughes improperly relied on text messages that Complainant sent to her friends to support her erroneous finding that Complainant looked for alternative housing as a result of Plaintiff's alleged assaults.

174.    Hughes misconstrued and inaccurately reported witness testimony.

175.    Hughes failed to assign any probative value to Plaintiff's relevant and exculpatory evidence.

176.    Hughes failed to fairly review exculpatory evidence Plaintiff provided.

177.    Contrary to the SGBH Policy, Plaintiff was not permitted to provide exculpatory evidence.

178.    Plaintiff sought to submit a picture of Complainant appearing happy and smiling while in Utah and photos from his home's security camera depicting Complainant freely entering and leaving his home after the dates of the alleged incidents.

179.    The Review Panel did not accept or review this evidence.

### K. Baylor's Faulty Credibility Determinations

180.    The SGBH Policy states, "the investigator will not consider statements of personal opinion or statements as to any party's general reputation for any character trait."

181.    Hughes used her personal opinion to find Plaintiff "not credible."

182.    During the Title IX Hearing, Hughes testified that when she made her findings, she used her personal opinion because Hughes believed the Complainant, notwithstanding significant evidence to the contrary, such as bank statements and text messages to Cruz indicating that Complainant's testimony regarding the purchasing of Plan B was false.

183.    Hughes also stated that she believed Complainant because she "offered details."

184.    However, Hughes actually asked Complainant to provide details before Complainant "offered details."

185.    Additionally, Complainant did not provide any details related to the second alleged instance of sexual assault.

186.    Complainant could not even provide a definitive date provided for the second alleged instance of sexual assault.

187.    Hughes did not make it clear that Plaintiff was required to "offer details."

188.    Hughes did not make it clear that a failure to "offer details" would impute a "negative" credibility finding against Plaintiff.

189.    Hughes used her own personal definition of "coercion," which does not appear in the SGBH Policy, in order to find Plaintiff "responsible."

190.    When confronted by the Title IX Review Panel, Hughes stated, "I did not feel that, um, force or the threat of force was a necessary component to find that coercion existed."

191.    Hughes did not rely on facts, reason, existing policies, or advice from supervisors

to form the definition of "coercion" that she used to find Plaintiff "responsible."

192.    The "details" that Hughes claims she relied upon to support her finding that "coercion" existed were directly contradicted by Complainant's testimony.

193.    Hughes stated that a lack of engagement from Complainant during sex supported a finding of coercion.

194.    Complainant testified that during their sexual encounter she kissed Plaintiff back, had her arms around him, let him take off her underwear, agreed to use a condom, and never asked him to stop or slow down.

195.    Complainant's statements regarding when and why she purchased Plan B were contradicted by her own bank statements and text messages with Cruz.

196.    Hughes ignored these inconsistencies and found Complainant "credible."

197.    Hughes ignored Complainant's admissions that the first alleged instance of sexual assault was consensual, that she asked Plaintiff to use a condom, and that Plaintiff agreed to do so.

198.    Complainant also stated in her second interview that she and Plaintiff agreed to use a condom when they had sex on May 20, 2018.

199.    Hughes improperly attempted to influence Complainant's testimony by stating "So you [Complainant] said 'No' and he [Plaintiff] did …"

200.    However, during this exchange, Complainant never said the word "no" to Hughes.

**L.  Baylor Denies Plaintiff The Equal Right To Participate In The Title IX Process**

201.    The SGBH Policy states, "During the investigation and adjudicatory process, both parties (complainant and respondent) have equal rights, including the opportunity to . . . participate in the investigation[.]"

202.    Baylor failed to provide Plaintiff with the same opportunity to participate in the

investigation that it provided to Complainant.

203.    English is Plaintiff's fourth language.

204.    While Plaintiff is a professor in economics and teaches his classes in English, he is able to express himself in this field with less effort than in other settings.

205.    As a result, Plaintiff requested a language accommodation.

206.    Specifically, Plaintiff asked for Hughes to provide her initial intake questions in writing so that he could provide his responses in writing.

207.    Hughes failed to make this accommodation.

208.    Instead, Hughes improperly and disingenuously characterized Plaintiff's language accommodation request as "declining to participate."

209.    Hughes' characterization was objectively false.

210.    Complainant's native language is English.

211.    Complainant did not require language accommodations.

212.    Without the requested language accommodation, Plaintiff was unable to fully participate in the investigation in the same manner that Complainant was able.

213.    All of the Title IX Review Panel members were female.

214.    The absence of male members on the Title IX Review Panel shows that there was no equal representation of Plaintiff and Complainant's peers among the individuals who would be adjudicating the claims.

**M. Baylor's Failure To Conduct A Fair And Impartial Investigation**

215.    The SGBH Policy states, "Title IX Coordinator will appoint one or more investigators to conduct a prompt, thorough, fair, and impartial investigation."

216.    Baylor has a history of conducting unfair Title IX investigations.

217.    Johnson encouraged Complainant to file a Title IX report against Plaintiff due to a presumption that, as a female complainant, she would prevail with or without good evidence against him.

218.    North informed Plaintiff that Baylor exhibits gender bias toward female complainants in Title IX investigations.

219.    North stated that Hughes was not capable of performing an unbiased or competent investigation.

220.    In August 2018, long before Hughes' investigation was complete and any decision was rendered, North sent Plaintiff "dismissal procedures" in anticipation of a "responsible" finding against Plaintiff.

221.    Hughes conducted an unfair Title IX investigation.

222.    Hughes refused to provide Plaintiff with a requested and necessary language accommodation.

223.    Contradicting her prior refusal to provide questions in writing as Plaintiff requested as part of his language accommodation, Hughes later sent follow up questions to Plaintiff in writing.

224.    These questions were irrelevant and were sent to bolster Hughes' predetermined finding against Plaintiff.

225.    For example, Hughes asked whether Plaintiff used the Economics Department's money to travel for pleasure.

226.    Plaintiff stated he did not, and North confirmed that Plaintiff's answer was true.

227.    Hughes questioned Plaintiff about his knowledge of Complainant's education status, which had no bearing on whether Complainant consented to sexual activity.

228.    Baylor had already determined that Plaintiff did not violate any personnel policies related to his relationship with Complainant.

229.    Hughes later admitted that these questions were "irrelevant" to the allegations and were unrelated to the Title IX investigation.

230.    Hughes sought to destroy Plaintiff's credibility with her irrelevant questions.

231.    Hughes testified that she "believed" Complainant and "credited that to her" when asked about the inconsistencies in her sexual exploitation findings.

232.    Hughes also testified that Complainant "stated that she felt like she does not have an option, or her wishes will not be heard."

233.    Hughes, therefore, based her findings on Complainant's subjective state of mind rather than the available facts, the parties' actions (agreement to use condom, mutual kissing, etc.), or existing Baylor policies.

234.    Hughes also utilized her own definition of "coercion" to fit Complainant's facts and find Plaintiff responsible.

235.    Hughes had a predetermined outcome she wanted to reach despite evidence which suggested otherwise.

236.    While he was defending himself, Plaintiff was met with open hostility in body language by Baylor officials.

237.    During Plaintiff's hearing, Melissa Morie, one of the panel members, rolled her eyes while Plaintiff was testifying.

238.    Plaintiff's translator noted that Morie rolled her eyes when Plaintiff asserted that having sex with a condom does not provide 100% protection from pregnancy.

239.    When Plaintiff went to the Title IX office to transcribe the report, he told Johnson

that he would be coming every day to transcribe the report manually.

240.    In response, Johnson rolled her eyes at Plaintiff.

241.    Plaintiff was constructively discharged on November 12, 2018.

242.    On November 12, 2018, North strongly encouraged Plaintiff to resign after Hughes' was complete.

243.    The Title IX Hearing was scheduled to occur on November 14, 2018.

244.    Still, North was sure, two days prior to the Title IX Hearing, that Plaintiff was going to be fired.

245.    North was aware that Baylor processes Title IX complaints against men and in favor of women.

246.    North apologized for what Plaintiff was going through.

247.    North indicated that Baylor's "general counsel" planned specific "public actions" that would force Plaintiff to resign if he did not do so voluntarily.

248.    Baylor informed Plaintiff that his case and the discipline issued to him were confidential and would not be disclosed.

249.    However, Baylor egregiously violated Plaintiff's confidentiality.

250.    On January 2, 2019, another professor at Baylor contacted Plaintiff and stated that while on a flight from Dallas to Waco, a Baylor attorney disclosed, "[Plaintiff] was terminated for sexually harassing a female student."

**FIRST CAUSE OF ACTION:**
**(VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 –**
**ERRONEOUS OUTCOME)**

251.    Plaintiff repeats and re-alleges each and every allegation stated above as if fully set forth herein.

252.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

253.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

254.    In its fiscal year ending May 31, 2019, Baylor received millions of dollars in federal funding for research and development.

255.    A school violates Title IX when gender is a motivating factor in its decision to impose discipline.

256.    Title IX requires schools to adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.

257.    Title IX requires that all educational institutions have policies and procedures that afford due process to both parties involved.

258.    The evidentiary and procedural errors rampant throughout the investigation and hearing constituted a denial of due process in this case resulting in an erroneous outcome based on an erroneous and distorted conception of the facts.

259.    Under Title IX, an educational institution must develop, implement and execute a hearing procedure which is substantially fair in nature.

260.    Challenges to university disciplinary proceedings on the basis of "erroneous

outcome" assert that the plaintiff was innocent and was wrongly found to have committed an offense and that gender bias was a motivating factor behind the erroneous findings.

261.    An erroneous outcome occurred in this case because Plaintiff was innocent and wrongly found responsible for sexual misconduct, and gender bias was a motivating factor.

262.    Evidentiary weakness and procedural flaws support a case of an erroneous outcome.

263.    As fully described above with pertinent examples detailed below, Baylor committed numerous evidentiary and procedural missteps throughout the disciplinary process.

264.    Hughes conducted an unfair and biased investigation, motivated by Plaintiff's male gender.

265.    Baylor permitted Hughes to conduct Plaintiff's Title IX investigation despite knowledge that she was biased and unfair.

266.    Baylor permitted Hughes to conduct Plaintiff's Title IX investigation despite knowledge that she lacked the capacity to perform such an investigation.

267.    Hughes failed to properly assess the available evidence.

268.    Hughes relied on her own subjective feelings rather than the SGBH Policy definitions or the actual facts and evidence in reaching her conclusions.

269.    Hughes ignored exculpatory evidence.

270.    Hughes improperly credited inconsistent evidence and testimony provided by Complainant.

271.    Baylor failed to provide Plaintiff with timely and equal access to information related to his case.

272.    Plaintiff was barred from submitting exculpatory evidence.

273.    Plaintiff was barred from fully participating in the Title IX process.

274.    Despite clear evidence that Complainant was incapable of providing specific details related to her allegations of sexual misconduct by Plaintiff, Baylor found Complainant to be credible.

275.    Despite clear evidence that Complainant provided incorrect details related to her allegations of sexual misconduct by Plaintiff, Baylor found Complainant to be credible.

276.    Despite the fact that Complainant provided inconsistent and illogical details related to her allegations of sexual misconduct by Plaintiff, Baylor found Complainant to be credible.

277.    Relying on the imprecise, incorrect, and non-credible testimony of Complainant and Cruz, Baylor found Plaintiff responsible.

278.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION:
## (VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964)

279.    Plaintiff repeats and re-alleges each and every allegation stated above as if fully set forth herein.

280.    Plaintiff is a member of a protected group.

281.    Baylor discriminated against Plaintiff on the basis of his sex.

282.    Plaintiff was qualified for the position that he held in the Baylor Economics Department.

283.    Plaintiff constructively discharged on November 12, 2018.

284.    Plaintiff was treated less favorably than other similarly situated female employees.

285.    Baylor's has a systematic gender bias against male respondents in Title IX matter.

286.    Female instructors at Baylor were not warned to avoid close contact with female

students.

287.    Female instructors at Baylor were not warned to leave their office doors open when meeting with female students.

288.    Female instructors at Baylor were not subject to adverse employment actions if they had close contact with female students.

289.    Bridgwater was permitted to cultivate relationships with female Baylor students.

290.    Bridgwater was permitted to have female students in her office with the door closed.

291.    Female professors at Baylor were permitted to date male students.

292.    In certain instances, female professors at Baylor married their male students.

293.    Female professors at Baylor who dated male students were not subjected to adverse employment actions.

294.    Female professors at Baylor who married male students were not subjected to adverse employment actions.

295.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering Baylor to vacate its disciplinary findings against Plaintiff and expunge all records relating to the disciplinary process that Baylor conducted against Plaintiff.

## THIRD CAUSE OF ACTION:
## (VIOLATION OF TEXAS LABOR CODE)

296.    Plaintiff repeats and re-alleges each and every allegation stated above as if fully set forth herein.

297.    Plaintiff is a member of a protected class.

298.    Baylor discriminated against Plaintiff on the basis of his sex.

{1148970.1 }                                    28

299.    Plaintiff was qualified for the position that he held in the Baylor Economics Department.

300.    Plaintiff constructively discharged on November 12, 2018.

301.    Plaintiff was treated less favorably than other similarly situated female employees.

302.    Baylor has a systematic gender bias against male respondents in Title IX matters.

303.    Female instructors at Baylor were not warned to avoid close contact with female students.

304.    Female instructors at Baylor were not warned to leave their office doors open when meeting with female students.

305.    Female instructors at Baylor were not subject to adverse employment actions if they had close contact with female students.

306.    Bridgwater was permitted to cultivate relationships with female Baylor students.

307.    Bridgwater was permitted to have female students in her office with the door closed.

308.    Female professors at Baylor were permitted to date male students.

309.    In certain instances, female professors at Baylor married their male students.

310.    Female professors at Baylor who dated male students were not subjected to adverse employment actions.

311.    Female professors at Baylor who married male students were not subjected to adverse employment actions.

312.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering Baylor to vacate its disciplinary findings against Plaintiff and expunge

all records relating to the disciplinary process that Baylor conducted against Plaintiff.

**FOURTH CAUSE OF ACTION:**
**(BREACH OF CONTRACT)**

313.     Plaintiff repeats and re-alleges each and every allegation stated above as if fully set forth herein.

314.     At all times stated herein, a contractual relationship existed between Plaintiff and Baylor as a result of promises made in the SGBH Policy.

315.     The SGBH Policy states, "During the investigation and adjudicatory process, both parties (complainant and respondent) have equal rights, including the opportunity to . . . participate in the investigation[.]"

316.     Baylor failed to provide Plaintiff with the same opportunity to participate in the investigation that it provided to Complainant.

317.     Baylor refused to provide language accommodations to Plaintiff that would permit him to meaningfully participate in the investigation.

318.     After rejecting Plaintiff's request for a language accommodation, Baylor falsely asserted that Plaintiff declined to participate in the Title IX process.

319.     In fact, Baylor's refusal to provide a language accommodation prevented Plaintiff from participating in the Title IX process.

320.     Complainant did not require any language accommodations.

321.     Because Complainant did not require any language accommodations, she was able to fully participate in the Title IX process.

322.     Baylor's failure to provide Plaintiff with an equal opportunity to participate in the Title IX process constitutes a breach of the SGBH Policy.

323.     As a result of Baylor's breach, Plaintiff has sustained economic and reputational

damages.

324.    Plaintiff was constructively discharged from his position at Baylor.

325.    Plaintiff has been falsely branded as a perpetrator of sexual misconduct.

326.    Plaintiff has been unable to obtain another professorship at another university following his constructive discharge from Baylor.

327.    The SGBH Policy states, "During the investigation and adjudicatory process, both parties (complainant and respondent) have equal rights, including . . . timely and equal access to information that will be used in disciplinary proceedings[.]"

328.    Baylor failed to provide Plaintiff with timely and equal access to the information that it used in the disciplinary proceedings.

329.    Despite Plaintiff's request to review the notes related to Complainant's intake meeting, Baylor refused to provide the notes.

330.    Baylor provided Complainant with access to the notes related to Plaintiff's intake meeting.

331.    Baylor utilized the notes related to Complainant's intake meeting during the disciplinary process even though Plaintiff did not have access to the notes.

332.    Baylor's failure to provide Plaintiff with timely and equal access to the notes related to Complainant's intake meeting constitutes a breach of the SGBH Policy.

333.    As a result of Baylor's breach, Plaintiff has sustained economic and reputational damages.

334.    Plaintiff was constructively discharged from his position at Baylor.

335.    Plaintiff has been falsely branded as a perpetrator of sexual misconduct.

336.    Plaintiff has been unable to obtain another professorship at another university

following his constructive discharge from Baylor.

337.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, expenses, costs and disbursements.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Baylor as follows:

(i)      on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for violation of Title VII of the Civil Rights Action of 1964, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering Baylor to vacate its disciplinary findings against Plaintiff and expunge all records relating to the disciplinary process that Baylor conducted against Plaintiff;

(iii)    on the third cause of action for violation of the Texas Labor Code, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering Baylor to vacate its disciplinary findings against Plaintiff and expunge all records relating to the disciplinary process that Baylor conducted against Plaintiff;

(iv)     on the fourth cause of action for breach of contract, a judgment against Defendant awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of future career prospects, plus prejudgment interest, expenses, costs and disbursements; and

(v)  awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

Dated: Round Rock, Texas
       August 9, 2019

By: /s/ R. Mark Dietz

**DIETZ & JARRARD P.C.**
R. Mark Dietz, Esq.
106 Fannin Avenue East
Round Rock, Texas 78664
Tel: (512) 244-9314
Email: mdietz@lawdietz.com

-and-

**WARSHAW BURSTEIN, LLP**
Kimberly C. Lau, Esq. (*pro hac vice* pending)
James E. Figliozzi, Esq. (*pro hac vice* pending)
555 Fifth Avenue, 11th Floor
New York, NY 10017
Tel: (212) 984-7700
Email: klau@wbny.com
       jfigliozzi@wbny.com

*Attorneys for Plaintiff John Doe*